IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DOROTHY COLEMAN, Administrator of the Estate of Johnnie Russell III, Deceased, <br><br> Plaintiff, <br><br> vs. <br><br> JEFFREY WIENCEK, THE CITY OF AURORA, ILLINOIS, and PROVENA HOSPITALS d/b/a Provena Medical Center, <br><br> Defendants. | Case No. 08 C 5275 |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Dorothy Coleman, the administrator of the estate of her late brother Johnnie Russell, has sued the City of Aurora, Aurora police officer Jeffrey Wiencek, and Provena Hospitals. She alleges that Wiencek and Aurora used excessive force that caused Russell's death in violation of his federal constitutional rights. She also asserts wrongful death claims against all the defendants.

The Court previously denied Provena Hospitals' motion for summary judgment. Aurora and Wiencek have also moved for summary judgment. For the following reasons, the Court denies the motion.

### Facts

On a motion for summary judgment, the Court draws "all reasonable inferences from undisputed facts in favor of the nonmoving party and [views] the disputed

evidence in the light most favorable to the nonmoving party." *Harney v. Speedway Super-America, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008).

Russell was admitted to the emergency department of Provena Mercy Medical Center (Provena) in Aurora on November 17, 2006. Coleman alleges that Russell suffered from Dilantin toxicity, altered mental stability, paranoid personality, and other medical conditions. Provena personnel evaluated him and recommended him for placement in the psychiatric ward.

Early the next morning, a nurse discovered that Russell was in possession of a handgun. Officer Liz Robinson, who was stationed at Provena that same morning, was preparing to leave the hospital when a member of the hospital's security staff approached her concerning Russell. The security officer described Russell as an uncooperative, combative patient. Robinson radioed Aurora Police Department (APD) dispatch to inform them that she was detained at the hospital due to a combative patient on the fifth floor. Robinson testified that in the elevator on her way up to the fifth floor, she heard a transmission on the security guard's radio saying that the patient possibly had a gun. She got on her police radio and asked the dispatcher to send other officers and a supervisor to the hospital to assist her.

When Robinson reached the fifth floor, a nurse informed her that he had gone into Russell's room, Room 532, to give him medication. The nurse fled the room when Russell pointed a small, silver handgun at him. Robinson walked towards Room 532 with her weapon drawn. She stood with her back against the wall to the left of the room's doorframe. Because the door was completely open, she was able to peer into the room with her back against the wall by just breaking the plane of the doorframe with

2

the right side of her face.

Robinson testified that when she looked into the room, Russell was facing the door and standing a few feet into the room, no more than ten feet away from her. She noticed that Russell had a roommate in the room with him, and that at least one oxygen tank was also in the room. When Russell saw her, he raised a silver, short double barrel handgun in his right hand and pointed it at her face. She immediately moved her head out of the doorway and took cover in the room next to Russell's room. She stood in a corner at the doorway of that room and had visibility of the doorway of Room 532, so she could see Russell if he walked out of his room.

Robinson testified that she had a conversation with Russell, although she could not see him as they were talking because he was inside his room. She stated that Russell told her to shoot him and said that if she did not shoot him, he would shoot her. He repeated these statements several times before the backup officers that Robinson had requested arrived. Robinson assured Russell that she was there to help him and that she did not want to harm him.

Once Russell stopped yelling and sounded calm, Robinson looked into his room a second time. She testified that he was standing in the same spot and that when he saw her, he dropped the gun to his right side and then put it behind his back. She moved back to the other room and continued talking to him. Robinson testified that eventually, Russell pushed the door shut. She continued to talk to him through the closed door to keep him calm until Sergeant Sibon arrived and tapped her on the shoulder. Sibon talked to Russell and convinced him to let his roommate out of the room. Two sergeants (including Sibon) and other officers arrived on the scene and

evacuated others from the fifth floor.  A standoff between Russell and the APD followed for the next several hours.

At or about 8:45 a.m., Officer Shireen Long arrived to serve as a hostage negotiator.  Sibon instructed Long to speak with Robinson before speaking with Russell.  Long also asked to speak with medical personnel familiar with Russell's condition.  They informed her that Russell "was taking Halidol for depression and that he had some mental issues."  Long Dep. 23.  Long was then positioned just outside the door to Room 532, while another officer stood nearby protecting her with a shield.  Sibon instructed Long to communicate with Russell, but told her that she was not to open the door or enter the room under any circumstances.

Once Long began communicating with Russell through the door, she believed him to be delusional because he was incoherent and emotionally unstable.  He would joke and make fun of her, talk about himself, or talk to himself.  And he repeatedly said that he would kill Long and anyone who came through the door.

Lieutenant Paul Nelson arrived to the hospital with the APD's "Special Response Team" (SRT).  Long informed the SRT that Russell was delusional and emotionally unstable and had threatened to kill her and others.  The SRT reconfigured the hallways, placed Long twelve to fourteen feet away from the door to Russell's room, and created a barrier. Nelson placed Officers Kevin Triplett, Jefferey Wiencek and Robert Hillgoth in a hallway approximately eight to ten feet away from the door to Room 532 behind a ballistics blanket that hung from the ceiling.  Though the blanket did not cover the entire width of the hallway (it left a gap of at least eighteen inches), it is designed to protect against most handgun rounds hitting the blanket.  Hillgoth was armed with a less-than-

4

lethal, super sock rifle that fires "bags" or "sock ammunition," which are intended to stun the individual.  Wiencek was armed with a standard rifle.  Nelson stationed himself in the room next door to Room 532.

At some point, Russell began requesting various beverages and pizza.  The police team and doctors decided to put drugs in the drink and food to put Russell to sleep.  They placed the food just outside the room, hoping that Russell would take it.  At about the same time, Nelson decided to drill a peephole through the wall to see what Russell was doing in case he dropped his gun.  Hostage negotiator Long was then instructed to join Triplett, Wiencek and Hillgoth behind the ballistics blanket.  She was given a megaphone to communicate with Russell because Nelson hoped the noise of the megaphone would drown out the drilling.  Long continued talking to Russell.  Though he seemingly lost interest in taking the food, Long would remind him from time to time that it was out there and urged him to take it.  Wiencek testified that he heard Russell respond,"Go ahead, go ahead and give the pizza that you made for me to the police officers around, because I know they're all around the place over there." Wiencek Dep. 54-55.  The hole Nelson drilled proved unhelpful because the room was too dark to see anything inside.

Nelson testified that he walked around and instructed everyone on the fifth floor, including Triplett, Wiencek, and Hillgoth, on the rules of engagement and potential use of force.  The officers were to allow Russell retrieve the food if he opened the door unarmed and attempted to pick it up.  Because Nelson would be unable to see Russell if he came out of the room, Wiencek was instructed to say, "Hey, it's okay" if Russell stepped out of the room unarmed.  Nelson Dep. 68.   If Russell seemed to want to get

5

the food, opened the door armed, but held the pistol in a non-threatening manner (for instance, down by his side), the officers were to allow him to take the food. If Russell stepped out of the room and presented his weapon in a threatening manner, however, the officers were to "use their best judgment as to what their response was going to be." Nelson Dep. 70. Nelson informed the officers that his preference was to use the less-than-lethal munition. Nelson testified, however, that if the officers felt their lives or the lives of their teammates were in immediate danger, he could not take the decision to use lethal force away from them.

Eventually, Russell opened the door to his room. Wiencek testified that he called out that the door was opening to warn others. The door opened partially, there was a pause, and then the door slowly closed again. Wiencek and Triplett testified that they did not see Russell when he partially opened the door, though Triplett stated he did see a part of Russell's gown. Approximately thirty to forty-five seconds later, Russell opened the door again. Long testified that she saw Russell when he opened the door the second time, and she did not see a gun in Russell's hand. She also testified that she saw him leaning towards his right, the direction he would have moved had he attempted to retrieve the food placed for him.

Triplett, Wiencek and Hillgoth testified that they saw Russell holding the gun in his left hand and pointing it in their direction. In response, Triplett immediately jumped for cover behind the ballistics blanket. He testified that as he took cover, he saw a flash from the area of Russell's gun and observed what he believed to be a round of ammunition striking the blanket. Hillgoth testified that he made eye-contact with Russell. Believing that Russell was intent on shooting at them, Hillgoth yelled "gun!"

6

and fired his super sock rifle several times. Shortly thereafter, Wiencek says, he saw a muzzle flash coming from Russell's pistol and then heard a loud noise. Believing that Russell was shooting at them, Wiencek shot him six times with his rifle. Minutes later, members of the SRT pushed open the door to Room 532 and found Russell lying on the floor dead. It was later determined that Russell never fired his weapon.

## Discussion

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). To determine whether a genuine issue of material fact exists, the Court must view the record in the light most favorable to the nonmoving party and draw reasonable inferences in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir. 2002). A genuine issue of triable fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

### I. Excessive force claim

Coleman's excessive force claim under 42 U.S.C. § 1983 is based on Wiencek's alleged violation of Russell's Fourth Amendment right to be free from unreasonable seizure. *See Graham v. Connor*, 490 U.S. 386, 395 (1989) (a police officer's use of force during an arrest or other seizure is analyzed under the Fourth Amendment's prohibition against unreasonable seizures). "A police officer's use of deadly force is a seizure and accordingly must be reasonable." *Muhammed v. City of Chicago*, 316 F.3d

7

680, 683 (7th Cir. 2002) (citing *Tennessee v. Garner*, 471 U.S. 1, 7 (1985)).

The Court's inquiry focuses on "whether the officer's decision to use deadly force was *objectively* reasonable." *Maravilla v. United States*, 60 F.3d 1230, 1233 (7th Cir. 1995) (citing *Graham*, 490 U.S. at 397) (emphasis in original). Whether an officer acts reasonably in using deadly force is determined "in light of the facts and circumstances confronting [him] at the moment [he] acted." *Id.* Furthermore, "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

Coleman alleges that it was unreasonable for Wiencek to shoot and kill Russell. Wiencek contends that he shot Russell to protect his fellow officers and others on the fifth floor. "[W]hen an officer believes that a suspect's actions [place] him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force." *Muhammed*, 316 F.3d at 683 (internal quotation marks and citation omitted).

The parties agree that Russell and the police officers were engaged in a standoff for several hours. Russell was armed, uncooperative, and he had threatened to shoot the officers. Hillgoth testified that when Russell opened the door, he pointed his weapon at them and made eye-contact with him. Believing that he was intent on shooting at them, Hillgoth yelled "gun!" and fired his sock rifle at Russell. Shortly thereafter, Wiencek shot Russell six times with his rifle. Wiencek testified that he fired his weapon because he believed that Russell fired his weapon at them.

Coleman contends that Wiencek should have resorted to alternative, non-lethal

8

measures before shooting Russell. For instance, she suggests that he could have hidden behind the ballistics blanket or that the officers could have given Russell a warning. But "the Fourth Amendment [does not] require[ ] the use of the least or even a less deadly alternative so long as the use of deadly force is reasonable under *Garner v. Tennessee* and *Graham v. Connor*." *Plakas v. Drinski*, 19 F.3d 1143, 1149 (7th Cir. 1994). The Seventh Circuit has also "held that, if the suspect threatens the officer with a weapon, the risk of serious physical harm to the officer or others has been established." *Bell v. Irwin*, 321 F.3d 637, 639 (7th Cir. 2003). Thus, if Russell pointed his gun at the officers, they acted reasonably in shooting him. *See Graham*, 490 U.S. at 396-97 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgements - in circumstances that are tense, uncertain and rapidly evolving - about the amount of force that is necessary in a particular situation.").

Coleman contends that a jury reasonably could find that Russell did not point his gun at the officers when he opened the door and that Triplett, Hillgoth and Wiencek did not actually believe they saw him do so. In support, Coleman refers to Long's testimony that when Russell opened the door, she saw him without a handgun and that he appeared to be moving to his right, toward the food. Long also testified that Russell would have moved to his right had he wanted to pick up the food the police had placed for him on the floor just outside his room.

Long's testimony raises a genuine issue of material fact concerning whether Russell had the gun in his hand when he opened the door. Although Triplett, Hillgoth, and Wiencek all say that they saw a gun in Russell's hand, based on Long's testimony,

9

a reasonable jury could find that he was not holding a gun and could not have been perceived to be doing so.  *See, e.g., Abdullahi v. City of Madison*, 423 F.3d 763, 772 (7th Cir. 2005) ("The sheer number of witnesses mustered by each side is not a relevant consideration, and cases may always be proven by circumstantial evidence where direct evidence is unavailable.") (internal citations omitted).  And if Russell was not holding a gun and could not have been perceived to be doing so, a reasonable jury could find that Wiencek's use of deadly force was unreasonable.  In short, the plaintiff's claim can be decided only after a trial.  *See generally id.* at 773 (because a Fourth Amendment reasonableness inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, . . . summary judgment . . . in excessive force cases should be granted sparingly" (internal quotation marks and citation omitted)).

Defendants raise additional arguments contending that some of the evidence Coleman submitted is inadmissible hearsay and that her expert's report is deficient because it is unsworn and improperly supplemented, in violation of Federal Rule of Civil Procedure 56(e)(1).  Because the Court's decision does not rely on the contested evidence or arguments based on that evidence, the Court need not address the arguments at this time.  Defendants may raise these issues in a motion *in limine*.

## II.     Qualified immunity

The doctrine of qualified immunity shields police officials performing discretionary functions from liability for civil damages when they "'act in ways they reasonably believe to be lawful.'"  *Chelios v. Heavener*, 520 F.3d 678, 690-91 (7th Cir. 2008) (citing

*Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987)).  Thus, "while the substantive constitutional standard protects officers' reasonable factual mistakes, qualified immunity protects them from liability where they reasonably misjudge the legal standard." *Catlin v. City of Wheaton*, 574 F.3d 361, 368-69 (7th Cir. 2009).  Determination of whether qualified immunity applies depends on whether the violation of a constitutional right occurred and whether the unconstitutionality of an officer's conduct was clearly established in the law at the time of the alleged misconduct.  *Pearson v. Callahan*, ___ U.S. ___, 129 S. Ct. 808, 816 (2009).  Courts "may address these issues in the order [they] deem most expedient."  *Catlin*, 574 F.3d at 365.

In *Pearson*, for instance, officers searched a trailer home when the respondent's daughter let them inside.  At the time of entry, the "consent-once-removed" doctrine had gained acceptance in many courts.  Although the court of appeals in the circuit covering the officers' jurisdiction had not ruled on the issue, the Supreme Court stated that "[p]olice officers are entitled to rely on existing lower court cases without facing personal liability for their actions."  *Pearson,* 129 S. Ct. at 823.

The issue in this case, however, does not involve whether the claimed constitutional right was clearly established.  It has been well established for years that the use of deadly force must be reasonable and that reasonableness is determined "in light of the facts and circumstances confronting [him] at the moment [he] acted." *Maravilla*, 60 F.3d at 1233.  Rather, the issue is whether Wiencek acted reasonably under the circumstances.

A key factual dispute prevents the Court from determining qualified immunity on

11

a motion for summary judgment. As described earlier, the dispute involves whether Russell was holding a gun or could have been perceived as doing so when he opened the door. Although three officers stated that he was holding a gun and pointing it at them, one officer testified that she did not see a gun. As the Court has stated, a jury could determine from her testimony that Russell did not have a gun and could not have been perceived to have one. Whether Wiencek's use of deadly force was reasonable largely depends on whether Russell pointed a gun at the officers. "[I]f the facts draw into question the objective reasonableness of the police action under the alleged circumstances, they must be developed in the district court before a definitive ruling on the [qualified immunity] defense can be made." *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996); *see also Chelios v. Heavener,* 520 F.3d 678, 692 (7th Cir. 2008).

In *Pearson*, the Supreme Court noted that qualified immunity protects officers from mistakes in judgment – including mistakes of law, fact, or mistakes based on law and fact. *Pearson*, 129 S. Ct. at 815. Defendants may contend that even assuming there was no gun in Russell's hand, Wiencek simply made a mistake of fact by seeing a gun pointed at him. But that, too, is genuinely disputed. Were a jury to believe Long's testimony over that of the other officers who did conclude that Russell was not holding a gun, it could go on to infer that Wiencek did not simply make a mistake.

For these reasons, the Court cannot determine qualified immunity on summary judgment.

**Conclusion**

For the foregoing reasons, the Court denies defendants Aurora and Wiencek's motion for summary judgment [docket no. 51]. The case is set for a status hearing on

April 22, 2010 at 9:30 a.m. for the purpose of setting a trial date.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: April 13, 2010